# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

ADVANCED DATA PROCESSING,　*
INC.,　　　　　　　　　　　　*
　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　*
　　　　　　　　　　　　　　*　　　CV 216-043
　　　　v.　　　　　　　　　*
　　　　　　　　　　　　　　*
NICOLE HILL,　　　　　　　*
　　　　　　　　　　　　　　*
　　　　Defendant.　　　　　*

## ORDER

Presently before the Court is Plaintiff Advanced Data Processing, Inc.'s ("Plaintiff") Motion for Temporary Restraining Order and Preliminary Injunction. Dkt. No. 11. The Court held an evidentiary hearing on this Motion on April 4, 2016, and permitted follow-up briefing. Dkt. No. 19. Upon due consideration, Plaintiff's Motion (dkt. no. 11) is **DISMISSED in part as moot** and **DENIED in part** as follows: the Motion is **DISMISSED as moot** to the extent that it seeks a temporary restraining order and a preliminary injunction requiring the return of its property, and it is **DENIED** insofar as it requests a preliminary injunction preventing the solicitation of its actual and prospective clients.

## FINDINGS OF FACT

Plaintiff, a wholly owned subsidiary of Intermedix Corporation ("Intermedix"), offers services to emergency medical services ("EMS") providers. Dkt. No. 19. Plaintiff's customers include privately held or publicly traded ambulance companies, state and municipal agencies that supply ambulance transport, and public hospital authorities that operate this service. Id. The core of Plaintiff's business is to provide revenue cycle management ("RCM") services, or outsourced medical billing services, to these entities. Id.

Defendant Nicole Hill ("Defendant") worked for Plaintiff from January 2014 until approximately March 17, 2016. Id. She served as a sales representative and was assigned to a territory consisting primarily of the southeastern United States. Dkt. No. 20, 4:3-4. Her role as a sales representative was to build relationships with potential customers and ultimately gain their business. Dkt. No. 19.

## I. Employee Training and Contracts

Plaintiff gives each new employee a packet of "onboarding papers" that contains the following: (1) the Intermedix Standards of Business Ethics and Conduct ("Standards of Conduct"); (2) an At Will and Policy Certification; and (3) a confidentiality and nonsolicitation agreement. Id. The

AO 72A
(Rev. 8/82)

Standards of Conduct includes the following language under the heading, "Confidentiality":

> Due to the nature of Intermedix's business and the sensitive information involved, the maintenance of confidentiality and security of protected health information (PHI) is one of the most important duties of each and every Team Member. Not only is it the right thing to do, it is a legal requirement.

> . . . .

**B.    CLIENT INFORMATION**

> Files and information related to clients of the Company are the sole property of the Company and/or the client. This includes but is not limited to:
> - Billing Contracts
> - Contracts
> - Hospital Contracts
> - Municipality/Government Contracts
> - Insurance Plan Contracts
> - Employer Contracts
> - Provider Files
> - Provider Numbers
> - Fee Schedules

> Team Members are required to maintain the privacy, confidentiality, security and integrity of client information and use such information only for the purpose of performing related duties.

**C.    TECHNOLOGY, INTELLECTUAL PROPERTY AND OTHER COMPANY INFORMATION**

> The backbone of Intermedix as a competitive business is its ability to develop and use technology in day-to-day operations. Failure to maintain control of this technological edge could cause the Company irreparable harm. Team Members are responsible for guarding Company technology against unauthorized disclosure. This applies to proprietary and private data developed or purchased by the Company or entrusted to the

AO 72A
(Rev. 8/82)

Company by clients or suppliers. These restrictions apply whether the information is in written or electronic form or is simply known by Team Members.

Intermedix assets also include confidential information relating to the present or planned business of the Company which has not been released publicly by authorized Intermedix representatives. Confidential information includes, for example:

- Pricing
- Inventions
- Financial Data
- Trade Secrets and Know-how
- Marketing and Sales Programs
- Research and Development Information
- Customer, Patient, and Supplier Information
- Team Member Information
- Corporate Objectives, Strategies and Tactics

Other Company information, such as personnel and payroll records, accounting information, passwords, security data, are subject to these confidentiality provisions. Team Members must not disclose confidential information to anyone outside the Company unless there exists a legitimate need for the information in order to work with Intermedix and all necessary entities have been properly authorized by management to receive such information. This obligation continues after a Team Member's termination of employment with Intermedix.

Innovations and ideas concerning products or manufacturing processes may be eligible for patent, copyright, trademark or other trade protection. Consult Intermedix Senior Management with questions.

Team Members, upon joining Intermedix, are required to sign an agreement under which they, as an employee of Intermedix, assume specific obligations relating to the treatment of Company

AO 72A
(Rev. 8/82)

and client confidential information and protected
health information (PHI). Violations may result
in immediate termination of employment and
possible further legal action.

The obligations of confidentiality and non-disclosure
set forth in these Standards are in addition to, and
are not in lieu of, any confidentiality obligations to
which a Team Member may be subject under any
applicable laws, rules, and regulations or pursuant to
any employment or non-disclosure agreement entered
into between such Team Member and Intermedix.

Dkt. No. 11, Ex. 1, pp. 10–12.

The At Will and Policy Certification requires that the
employee acknowledge, in part, that she "ha[s] access to and
ha[s] read, understand[s] and will abide by Intermedix's
policies and procedures . . . , including the Intermedix
Standards of [Conduct]." Dkt. No. 11, Ex. 2. The employee must
sign this and the other documents in the onboarding packet and,
within the first month of employment, complete a training course
on the company's policies. Dkt. No. 19.

Upon joining the company, Plaintiff signed every paper in
her onboarding packet other than the confidentiality and
nonsolicitation agreement, on which she filled in her name at
the top but did not include her signature in the space provided
at the bottom. Id. Nevertheless, Defendant's onboarding packet
was placed in her personnel file and—in what Plaintiff's Vice
President of EMS Sales, William Ryan ("Ryan"), and its General
Counsel and Chief Compliance Officer, Melissa ("Leigh"),

AO 72A
(Rev. 8/82)

categorize as an "oversight" by the company—Defendant was never required to sign the confidentiality and nonsolicitation agreement as a condition to her employment. Id. As Leigh recognized at the hearing on April 4, 2016, Defendant signed the At Will and Policy Certification agreeing to be bound by the Confidentiality provision in the Standards of Conduct—which limits the use of confidential information to Plaintiff's business purposes only and which applies postemployment—but never executed any document mentioning solicitation or placing any time limitation on her confidentiality obligations. Id. In each year following her hiring, Defendant signed a Standards Agreement certifying only her continued assent to the terms of the Standards of Conduct. See Dkt. No. 11, Ex. 3.

## II. Business Development

Plaintiff currently has 330 clients across the United States but has identified approximately 11,000 of the 25,000 EMS providers nationwide as "qualified prospects." Dkt. No. 19. A "qualified prospect" is an EMS provider that Plaintiff has researched or met and determined to be a good candidate for its services, and that will be able to contract within the next one to three years. Id. Ryan, who also testified at the hearing, estimated that roughly 3,000 of Plaintiff's 11,000 qualified prospects are located in the southeastern states that made up Defendant's sales territory. Id.

AO 72A
(Rev. 8/82)

To identify these qualified prospects, Plaintiff, through Defendant and other sales agents, has engaged in the following process:

- Plaintiff learns of EMS providers through its contacts, at trade shows, and on the Internet. Id. Some EMS providers put out a request for proposal ("RFP"), which is a public solicitation to obtain bids for RCM services from vendors such as Plaintiff. Dkt. No. 20, 5:6-11.

- To find more information about a given EMS provider, Plaintiff may look at the provider's Web site, which sometimes lists its number of transports and other information regarding its business. Dkt. No. 19. For some providers, Plaintiff makes an open-records request to obtain data concerning the entity's current contract for services with another vendor, communications with the vendor, run reports, and financial reports. Id. For information not in the public records, Plaintiff cold calls or otherwise gets in touch with the EMS provider and asks for a meeting to discuss its level of satisfaction with its current vendor, its volume of transport services, and other information. Dkt. No. 20, 5:12-21.

- Once Plaintiff gathers this data, it runs the data through a financial model that it has designed to take

into account a variety of factors—such as whether the provider is profiting and whether it is billing compliantly—and ultimately determine how much Plaintiff could charge the entity for its services and whether it would be profitable for Plaintiff to pursue its business. Dkt. No. 19.

After identifying a qualified prospect, Plaintiff seeks to develop a relationship with the entity through regular contact and meetings. Id. If the entity is currently under contract with one of Plaintiff's competitors, Plaintiff attempts to build a relationship during the one- to two-year period before the expiration of that contract, so that Plaintiff may gain the entity's business after that time. Id. As their relationship builds, a qualified prospect often shares information with Plaintiff that is not available to the general public, such as details about its satisfaction with its current vendor or its intention to seek a sole-source contract in the future, and Plaintiff keeps logs of this information. Id.

## III. Defendant's Departure

On February 23, 2016, Defendant informed Ryan that EMS Management and Consultants, Inc. ("EMS/MC"), Plaintiff's direct competitor in the RCM-services industry, had offered her a job. Id. Although Plaintiff endeavored to incentivize Defendant to stay in its employ, Defendant later informed Ryan and other

AO 72A
(Rev. 8/82)

company representatives that she was leaving the company in an e-mail dated March 17, 2016. Dkt. No. 11, Ex. 4, p. 2.

As is customary upon an employee's departure, Ryan logged into Defendant's company e-mail account to review the status of her correspondence with clients. Dkt. No. 19. Ryan discovered that Defendant had sent certain documents from her company account to her personal e-mail address in the weeks prior to her separation, including the following:

- a slideshow presentation that Defendant had prepared and presented to management listing each qualified prospect in her territory with its potential dollar value (as determined by Plaintiff's financial model), due date for any RFP, date on which Plaintiff could close on its business, motivation in contracting for services, and key contact person, id.; see also dkt. no. 17, ex. 2, pp. 8-16;

- a "rollout pipeline" spreadsheet displaying the clients with whom Plaintiff had recently contracted and was experiencing issues in the early stages of execution, dkt. no. 19; see also dkt. no. 17, ex. 3, pp. 2-5; and

- a document outlining a comprehensive sales strategy that Plaintiff had prepared with the help of a consulting firm and was about to introduce to its sales people across the country, dkt. no. 19; see also dkt. no. 17, ex. 5.

AO 72A
(Rev. 8/82)

According to Ryan, Defendant did not need to forward these e-mails to her personal account to access the attached documents outside of the workplace, because the company has a secured server that is accessible remotely and even by mobile phone. Dkt. No. 19. Defendant, however, maintains that she forwarded each of the e-mails for one of several reasons: (1) because the e-mail thread contained an accolade from a supervisor that she wanted to keep in an "accolades" folder on her personal computer; (2) because the attachment included information relevant to her earning of commissions and thus her ability to make her upcoming housing and other personal bill payments; and (3) because she preferred to work on documents using the operating system on her personal computer. Dkt. No. 20, 9:18-21, 11:14-21, 13:10-11. Plaintiff disputes the "accolade" justification, insisting that Defendant sent a blank e-mail with the document at issue attached rather than forwarding the e-mail thread that included her supervisor's remarks. Dkt. No. 21, p. 7 n.3 & Ex. 1, ¶ 5.

Ryan also suspected, following Defendant's departure, that she had contacted two of its current customers on behalf of EMS/MC. Dkt. No. 19. According to Defendant, however, it was the customers that had called her and inquired about meeting to discuss business opportunities with her new company. Dkt. No. 20, 14:17-25. Leigh sent an e-mail to Defendant on March 18,

AO 72A
(Rev. 8/82)

2016, reminding her of her agreement to abide by the Confidentiality provision in the Standards of Conduct following her employment. Dkt. No. 11, Ex. 5.

## IV. Plaintiff's Action for Injunctive Relief

Plaintiff filed a verified Complaint against Defendant on March 29, 2016, seeking injunctive relief on grounds of breach of contract, misappropriation of trade secrets, and tortious interference with business relations. Dkt. No. 1. Along with the Complaint, Plaintiff made the instant Motion for a temporary restraining order and preliminary injunction requiring that Defendant return her company computer and the documents that she sent to her personal e-mail account, and to refrain from contacting Plaintiff's current and prospective clients. Dkt. Nos. 8, 11. Plaintiff served Defendant with a copy of the Complaint and a Summons on March 30, 2016. Dkt. No. 12.

The Court held a hearing on Plaintiff's Motion on April 4, 2016, at which both parties were present and represented by counsel. Dkt. No. 19. The parties and their counsel conferred at the hearing and agreed that Defendant would return the computer and written documents, give copies of all electronic documents to her counsel, and permanently delete the electronic documents from her personal e-mail account and computer. Id. The parties further agreed that the only remaining issue with

AO 72A
(Rev. 8/82)

respect to Plaintiff's Motion is the request to enjoin Defendant from soliciting its actual and prospective clients.  Id.

Though absent from both the Complaint and Motion, Plaintiff clarified the parameters of the requested injunctive relief at the hearing and in its posthearing brief: the injunction against solicitation would be limited to the clients and qualified prospects listed in the documents that Defendant transmitted to her personal e-mail account, and—while the permanent injunction sought in the Complaint is intended to last for a period of one to two years, id.—the preliminary injunction would enjoin solicitation only during the pendency of this case, dkt. no. 21, pp. 1-2.  Defendant testified at the hearing that she has no intention to contact Plaintiff's current customers, and that her new employer, in fact, has a policy prohibiting her from doing so, but that she cannot prevent those customers from contacting her to do business.  Dkt. No. 20, 10:11-20.  She also indicated that she has initiated contact with approximately a dozen of Plaintiff's qualified prospects since her separation.  Id. at 15:5-21.

After oral argument, the Court directed the parties to file supplemental briefing on the solicitation issue.  Dkt. No. 19. Those briefs are now before the Court, see dkt. nos. 21-22, 24, and Plaintiff's Motion is ripe for review.

AO 72A
(Rev. 8/82)

## CONCLUSIONS OF LAW

### I.    Temporary Restraining Order

A court may issue a temporary restraining order without notice to the adverse party only if

> (A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adversary party can be heard in opposition; and
>
> (B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b).

Because Defendant received notice of this action after Plaintiff filed the instant Motion, dkt. no. 12, Plaintiff's request for a temporary restraining order is now moot.   This portion of Plaintiff's Motion is **DISMISSED**.

### II.    Preliminary Injunction

Before a preliminary injunction may issue, the moving party must give notice to the adverse party and post security in an amount sufficient to pay the adverse party's costs and damages in the event that she is wrongfully enjoined.   Fed. R. Civ. P. 65(a)(1), (c).   Plaintiff's counsel confirmed that Plaintiff was prepared to post any security payment directed by the Court. Dkt. No. 19.   Additionally, to be eligible for a preliminary injunction, the movant must establish each of the following elements:

AO 72A
(Rev. 8/82)

> (1) it has a substantial likelihood of success on
> the merits; (2) irreparable injury will be
> suffered unless the injunction issues; (3) the
> threatened injury to the movant outweighs
> whatever damage the proposed injunction may cause
> the opposing party; and (4) if issued, the
> injunction would not be adverse to the public
> interest.

Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26

(11th Cir. 2005) (quoting Klay v. United Healthgroup, Inc., 376

F.3d 1092, 1097 (11th Cir. 2004), and Suntrust Bank v. Houghton

Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001)). "'[A]

preliminary injunction is an extraordinary and drastic remedy

not to be granted unless the movant clearly establishe[s] the

burden of persuasion' as to each of the four prerequisites."

Siegel v. LePore, 234 F.3d 1163, 1176-77 (11th Cir. 2000)

(quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306

(11th Cir. 1998)).

Plaintiff fails to meet its burden of demonstrating that it

is entitled to a preliminary injunction. To the extent that

Plaintiff seeks an injunction requiring that Defendant return

the laptop computer and e-mailed documents, its Motion is

**DISMISSED as moot** based on the agreement of the parties at the

hearing, see dkt. no. 19. Plaintiff's remaining request—that

the Court enjoin Defendant from contacting its clients and

prospective clients—is due to be denied, because Plaintiff fails

AO 72A
(Rev. 8/82)

to show a substantial likelihood that it will prevail on the merits of its claims, as is required under the first element.

### A. Breach of Contract Claim

Under Georgia law, a plaintiff asserting a breach of contract claim must prove "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Canton Plaza, Inc. v. Regions Bank, Inc., 732 S.E.2d 449, 454 (Ga. Ct. App. 2012) (emphasis removed) (quoting Duke Galish, LLC v. Manton, 707 S.E.2d 555 (Ga. Ct. App. 2011)).

Plaintiff does not point to any evidence, at this stage, that suggests that Defendant breached any contractual duty in contacting its actual or prospective clients following her departure. The parties do not dispute that Defendant never signed the confidentiality and nonsolicitation agreement in her onboarding packet. Dkt. No. 19. Although Defendant executed the At Will and Policy Certification and the Standards Agreement representing that she would abide by the Standards of Conduct both during and after her employment, dkt. no. 11, exs. 2-3, she did not undertake any obligation not to solicit customers in doing so. The Confidentiality provision in the Standards of Conduct precludes only the "disclos[ure] [of] confidential information to anyone outside the [c]ompany unless there exists a legitimate need for the information in order to work with

AO 72A
(Rev. 8/82)

Intermedix." Dkt. No. 11, Ex. 1, p. 12. As the provision defines "confidential information" as including "[f]iles and information related to clients of the [c]ompany" and "information relating to the present or planned business of the [c]ompany," id. at ex. 1, p. 11, perhaps Defendant's e-mailing of client and sales-strategy documents would have contravened her duty of confidentiality had she disclosed the information to her new company. However, because the Standards of Conduct are silent as to competing against Plaintiff or soliciting its actual or prospective customers—and nothing suggests that these activities involve any "disclosure" of confidential client files or sales information—Plaintiff's contacting of these customers did not constitute a breach of any obligation under the Standards of Conduct.

In its most recent briefing on the issue, Plaintiff continues to underscore that Defendant's e-mailing of client documents breached her confidentiality obligations under the Standards of Conduct. See Dkt. No. 21, pp. 6-7. Even assuming the wrongfulness of that conduct, this argument is moot based on Defendant's agreement to return the documents. Equally unconvincing is Plaintiff's suggestion that Defendant's forwarding of documents is indicative of her intentions in contacting its qualified prospects. See id. Defendant's motivation for contacting those entities is irrelevant, as

AO 72A
(Rev. 8/82)

Defendant had no contractual duty not to solicit them in the first place. Without sufficient evidence of any contractual breach at this time, Plaintiff fails to demonstrate that its contract claim supports the issuance of a preliminary injunction.

### B. Misappropriation of Trade Secrets Claim

The Georgia Trade Secrets Act of 1990, O.C.G.A. §§ 10-1-760 to -767 (the "Trade Secrets Act"), provides that a court may enjoin actual or threatened misappropriation of a trade secret, even in the absence of a contractual agreement prohibiting the same. O.C.G.A. § 10-1-762(a), (d). "Misappropriation" refers to "the acquisition, disclosure, or use under specified circumstances of a 'trade secret.'" Smith v. Mid-State Nurses, Inc., 403 S.E.2d 789, 789-90 (Ga. 1991) (citing O.C.G.A. § 10-1-761(2)). Georgia law defines a "trade secret" as information that

> (A) [d]erives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).

"[A] list of actual or potential customers" may constitute a trade secret if, in addition to satisfying the above

AO 72A
(Rev. 8/82)

requirements, it is "not commonly known by or available to the public." Id. "[C]ustomer lists which are simply compilations of public information and which could be as easily compiled by third parties [are] not . . . deemed to constitute trade secrets." Robert B. Vance & Assocs., Inc. v. Baronet Corp., 487 F. Supp. 790, 799 (N.D. Ga. 1979). By contrast, where a party compiling a customer list, "while using public information as a source, . . . expends a great deal of time, effort and expense in developing the list[] and treats the list[] as confidential in its business, the list[] may be entitled to trade secret protection." Id. However, even in the latter case, the list is protected only to the extent that competitors do not duplicate the party's efforts through legitimate independent research. Penalty Kick Mgmt. Ltd. v. Coca-Cola Co., 164 F. Supp. 2d 1376, 1380 (N.D. Ga. 2001) (quoting Essex Grp. v. Southwire Co., 501 S.E.2d 501, 501 (Ga. 1998)), aff'd, 318 F.3d 1284 (11th Cir. 2003). Where the client list includes nonpublic information uniquely known by the party—for example, who referred a customer, what services it needed, or whether it is susceptible to poaching by a competitor—the list is protected. See, e.g., Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc., 793 F. Supp. 2d 1302, 1311 (N.D. Ga. 2011) (citing Paramount Tax & Accounting, LLC v. H & R Block E. Enters., 683 S.E.2d 141, 147 (Ga. Ct. App. 2009)).

AO 72A
(Rev. 8/82)

Significantly, it is only the tangible customer list that is the property of the party and warrants protection as a trade secret in these instances. DeGiorgio v. Megabyte Int'l, Inc., 468 S.E.2d 367, 369 (Ga. 1996) (citing O.C.G.A. § 10-1-761(4) and Avnet, Inc. v. Wyle Labs., Inc., 437 S.E.2d 302, 302 (Ga. 1993)). The information reflected in the customer list is not itself inherently confidential; "[c]ustomers are not trade secrets." Bacon v. Volvo Serv. Ctr., Inc., 597 S.E.2d 440, 443 (Ga. Ct. App. 2004) (quoting Crews v. Roger Wahl, C.P.A., P.C., 520 S.E.2d 727, 732 n.4 (1999)). "[U]tilizing personal knowledge of customer and vendor information. . . . may be forbidden through the use of restrictive covenants, but not under the Trade Secrets Act." DeGiorgio, 468 S.E.2d at 369 (citing Avnet, Inc., 437 S.E.2d at 302).

The Amedisys decision illustrates this point. See Amedisys Holdings, LLC, 793 F. Supp. 2d at 1302. In Amedisys, the employer-plaintiff filed suit against three of its former sales representatives after they allegedly took confidential and trade-secret materials and used them to benefit their new employer. Id. at 1305. Relevant here is that the first employee had sent copies of the plaintiff's patient referral logs—which contained information on patients from geographic areas in which the employee had not worked during her employment—both to her personal e-mail account and to the second

employee-defendant. Id. at 1305-06. The third employee had
inadvertently kept a workbook listing doctors in her territory
that frequently referred patients for services, but later
returned the workbook at the plaintiff's request. Id. at 1305-
06, 1309. All three employees had solicited business at
hospitals and patient care centers on behalf of their new
employer after leaving the company. Id. at 1306.

In ruling on the plaintiff's motion for a preliminary
injunction against soliciting its current and prospective
clients, the court determined that the plaintiff succeeded in
establishing a likelihood of success on the merits of its
misappropriation claim against only the first employee. Id. at
1311-13. The court cited evidence revealing that the first
employee was being untruthful about her reason for e-mailing
herself the log sheets and was, in fact, using them to solicit
business on behalf of her new employer. Id. at 1311-12. As to
the other employees, the court noted the absence of any evidence
that they had used the materials that they had received or
neglected to return, for the benefit of their new employer. Id.
at 1312-13. With regard to the third employee in particular,
the court emphasized that she had promptly returned the workbook
and, in any event, had developed such substantial relationships
with the doctors that she did not need to consult the workbook
to know whom to contact to generate business. Id.

AO 72A
(Rev. 8/82)

Even assuming, without deciding, that Plaintiff's lists of actual clients and qualified prospects meet the statutory requirements of a "trade secret," there is insufficient evidence, at this stage, that Defendant misappropriated that information. Contrary to Plaintiff's contentions, dkt. no. 21, pp. 12-15, Defendant is unlike the first employee in Amedisys, in that she was responsible for the sales territory in which the entities listed in the e-mailed documents are located, and she assisted in compiling these lists during her employment with Plaintiff. See Dkt. No. 19; Dkt. No. 20, 4:3-4. Moreover, the Court finds Defendant's testimony as to her reasons for forwarding the e-mails to be credible and believes, for the purposes of this Motion, that she did not intend to use the attached materials to poach Plaintiff's current or prospective clients. See Dkt. No. 20, 9:18-21, 11:14-21, 13:10-11.

Rather, Defendant is more similar to employees two and three in Amedisys, as there is no evidence indicating that she used the e-mailed materials to the benefit of EMS/MC at any time. Furthermore, like the third employee in that case, Defendant has since returned or deleted the documents, and nothing suggests that her limited communications with Plaintiff's actual or prospective clients since her departure were generated by anything other than her preexisting knowledge of and relationships with these entities. See, e.g., id. at

21

4:3-4, 10:11-20, 15:5-21. While Plaintiff has multiple legal mechanisms available to prevent an employee from utilizing her personal knowledge of the industry to contact customers after leaving the company, the Georgia Trade Secrets Act is not one of them. Plaintiff thus fails to show that it is likely to prevail on its misappropriation claim.[1]

Absent a substantial likelihood that it will succeed on the merits of these claims, Plaintiff cannot meet its burden of establishing that the extraordinary remedy of a preliminary injunction is appropriate in this case. Accordingly, the Court need not evaluate the remaining preliminary-injunction elements to conclude that Plaintiff's Motion seeking to enjoin Defendant from contacting customers must be **DENIED**. See Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011) ("If [the movant] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements."); Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) ("[W]hen a plaintiff fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction.").

---

[1] While Plaintiff also brings claim for tortious interference with business relations, dkt. no. 1, it does not rely on this claim as a basis for seeking a preliminary injunction in this Motion, see dkt. no. 11.

AO 72A
(Rev. 8/82)

## CONCLUSION

For the reasons stated above, the relevant considerations counsel against granting Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiff's Motion (dkt. no. 11) is **DISMISSED in part as moot** and **DENIED in part** at this time: it is **DISMISSED** in that Plaintiff's requests for a temporary restraining order and a preliminary injunction for the return of property are now moot, and it is **DENIED** in that Plaintiff is not entitled to a preliminary injunction precluding Defendant from contacting its actual and prospective clients. All of these conclusions are based on the evidence presently before the Court. Obviously, if, during discovery, contrary evidence were to be developed, it may bear reexamination.

**SO ORDERED**, this 14TH day of April, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)